IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MELANIE J. CARSON, | ) | CASE NO. 1:15CV2408 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE BENITA Y. PEARSON |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Melanie Carson ("Carson") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

As set forth more fully below, the Administrative Law Judge ("ALJ") failed to provide an explanation supported by substantial evidence when he found that Carson's mental impairments did not meet or medically equal Listing 12.05(C).  Accordingly, the undersigned recommends that the Commissioner's decision be **REVERSED** and **REMANDED** for further proceedings consistent with this opinion.

**I. Procedural History**

On November 16, 2011, Carson filed an application for SSI, alleging a disability onset date of January 13, 2000.  Tr. 16, 166.  She alleged disability based on the following: learning disability, arthritis, disc disorder in back, general pain, and high cholesterol.  Tr. 259.  After

1

denials by the state agency initially (Tr. 87) and on reconsideration (Tr. 104), Carson requested an administrative hearing. Tr. 123, 126. A hearing was held before Administrative Law Judge ("ALJ") Peter Beekman on November 6, 2013. Tr. 38-67. At the Hearing, Carson amended her alleged onset date to November 16, 2011. Tr. 40-41, 165. In his May 20, 2014, decision (Tr. 16-32), the ALJ determined that there are jobs that exist in significant numbers in the national economy that Carson can perform, i.e., she is not disabled. Tr. 30. Carson requested review of the ALJ's decision by the Appeals Council (Tr. 11-12) and, on September 25, 2015, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-4.

## II. Evidence

### A. Personal and Vocational Evidence

Carson was born in 1982 and was 29 years old on the date her application was filed. Tr. 166. She previously worked as a temporary laborer through a temp agency and in food service at fast food restaurants. Tr. 41. She went to high school up to tenth grade but did not finish tenth grade. Tr. 41.

### B. Medical Evidence[1]

On April 30, 2010, Carson went to the Metro Emergency Room for noncardiac chest pain that she believed was related to anxiety. Tr. 397-399. Her medical note history included a diagnosis for depressive disorder and nondependent cocaine abuse. Tr. 403.

On May 29, 2010, Carson was admitted to Bridgeway Crisis Unit with suicidal thoughts after presenting to an emergency room. Tr. 355. She was diagnosed with depressive disorder and traits of bipolar disorder. Tr. 346. During her assessment, she had a mildly distrustful

---

[1] Carson challenges the ALJ's decision only with respect to her mental impairments. *See* Doc. 13, p. 2. Accordingly, only the medical evidence relating to Carson's mental impairments is summarized herein.

2

demeanor, average eye contact and clear speech. Tr. 348. She had no delusions or hallucinations. Tr. 348. She reported attending Alcoholics Anonymous ("AA") meetings daily and stated that she had been sober for five years. Tr. 351.

On June 10, 2010, Carson went to the emergency room at Lutheran Hospital for depression and was diagnosed with mood disorder. Tr. 518. She was given medication and discharged in stable condition. Tr. 518.

On September 2, 2011, Carson saw Martin Berger, M.D., at Metro Hospital, complaining of insomnia and racing thoughts. Tr. 635-636. Dr. Berger diagnosed her with mania. Tr. 636.

On April 24, 2012, Carson was admitted to the emergency room at Metro for anxiety and alleged suicidal ideation. Tr. 1201. She denied being suicidal but stated that she would become suicidal if she did not get her medication, Abilify, which she was unable to get because of insurance issues. Tr. 1203. She was sent home in stable condition after receiving some Abilify. Tr. 1205. She was instructed to follow up at the social work office the next day for medication vouchers. Tr. 1205.

Carson underwent a mental health assessment at Metro Hospital on May 18, 2012, with licensed social worker Michelle Brzozowski. Tr. 1168-1174. She complained, "I am not doing so well. I'm really anxious and I'm out of my meds." Tr. 1168. Brzozowski reviewed a prior treatment record wherein Carson reported anxiety and nightmares regarding her multiple rapes in addition to paranoid thoughts involving one of her rapists. Tr. 1169. Carson told Brzozowski that she had vague thoughts of suicide, had been seeking help through a rape crisis center, felt hyper all the time and had racing thoughts, and denied hallucinations. Tr. 1169. She stated that she was diagnosed with a learning disability as a child, "had involvement with the Board of DD," and was on disability as a child. Tr. 1169. She cannot read or write well and stated that she

"acts like a 14-year old child." Tr. 1169.  Carson had been in foster care as a child, had seven children of her own, and all her children had been taken away from her due to her past history of drug and alcohol issues and neglect.  Tr. 1169.  She was currently living with her boyfriend.  Tr. 1172.

Carson stated that her current anxiety was "unbearable" and she felt like she was having a heart attack, although Brzozowski noted that she "did feel comfortable completing this initial assessment."  Tr. 1169.  Upon exam, she was adequately groomed, cooperative and anxious.  Tr. 1173.  She was oriented and her speech and thought process were normal.  Tr. 1173.  Her insight and judgment were good, she had good recent and remote memory, and sustained attention and concentration.  Tr. 1173.  Her mood was anxious.  Tr. 1173.  Brzozowski diagnosed her with Anxiety Disorder, PTSD, Mood Disorder, and Borderline Intellectual Functioning and assigned a Global Assessment of Functioning ("GAF") score of 41-50.[2]  Tr. 1173.  Following the assessment, Brzozowski escorted Carson to the emergency department for further evaluation and Carson was discharged by the emergency room with refills of her medication.  Tr. 1173.

On July 24, 2012, Carson took an overdose of Neurontin, Depakote, and Lexapro and, after being seen at the Metro emergency room, was discharged after medical clearance.  Tr. 1061, 1309.  On July 27, 2012, she again went to the emergency room after having stated that she would overdose on any medication she had available.  Tr. 1061, 1309.  She denied hallucinations.  Tr. 1061.  She admitted smoking crack on July 24, 2012.  Tr. 1062.  She was transferred and then discharged with a recommendation that she seek inpatient treatment.  Tr. 1310.

---

[2] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: Diagnostic & Statistical Manual of Mental Health Disorders, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)."  *Id.*

On August 20, 2012, Carson was admitted to the Metro emergency room for suicidal ideation.  Tr. 1002-1011.  She reported attempting to overdose on Trazadone and Risperdal the night before, went to the hospital, but then "ran away."  Tr. 1002, 1006, 1012.  She stated that she left the hospital because they were taking too long.  Tr. 1012.  She denied having thoughts about hurting herself but her anxiety was "high" and she has been unable to sleep.  Tr. 1012.  "I just found out I have fibromyalgia and t[he] pain is keeping me up."  Tr. 1012.  She stated that her mind is racing and she hears voices telling her to harm herself.  Tr. 1012.  Upon exam, she was adequately groomed and cooperative, had spontaneous, normal speech, a logical and organized thought process, and a depressed mood.  Tr. 1013.  Her memory was intact and her concentration was sustained.  Tr. 1013.  Smila Kodali, M.D., diagnosed her with anxiety disorder, PTSD, mood disorder, and a rule out for borderline intellectual functioning v. mild intellectual disability.  Tr. 1013.

On August 28, 2012, Carson was readmitted to Metro Hospital for suicidal ideation.  Tr. 979-980.  She was planning to overdose on medication and reported hearing thousands of voices in her head telling her to overdose on her medication.  Tr. 980.

On September 10, 2012, Carson was admitted to St. Vincent Charity Medical Center for suicidal and homicidal ideation.  Tr. 1338.  She reported auditory hallucinations telling her to kill herself and her children.  Tr. 1338, 1342.  Her speech was normal, she had appropriate mood and affect, she was awake, alert and oriented, and she had spontaneous thoughts.  Tr. 1338.  She was diagnosed with schizoaffective disorder and adjustment disorder.  Tr. 1343.

On October 22, 2012, Carson underwent an initial psychiatric evaluation at Connections with Mariela Herrera-Rojas, M.D.  Tr. 1373-1377.  Carson reported depression since she was five years old, trouble sleeping due to pain from fibromyalgia and nightmares caused by PTSD

5

from multiple rapes, the most recent one occurring "a couple of weeks ago by a stranger." Tr. 1373. She did not go to the police because she has a history of prostitution and she does not trust the police. Tr. 1373. She lies in bed all day except when she goes to the store, an AA meeting, or to visit her mother once a month. Tr. 1373. She last worked when she was 17. Tr. 1375. She had problems with anxiety, which caused her to have a racing heart, sweat, and shake for a few hours. Tr. 1373. She denied hallucinations. Tr. 1374. Upon exam, her mood was severely depressed and she had a moderately constricted affect. Tr. 1374. She was cooperative, made average eye contact, and had clear speech. Tr. 1374. Dr. Herrera-Rojas diagnosed her with Schizoaffective Disorder, PTSD, Anxiety Disorder, and Dependent Personality Disorder and assessed a GAF score of 50. Tr. 1375.

On January 14, 2013, Carson complained of auditory hallucinations directing her to overdose on medications, cut her wrists, or hang herself. Tr. 1370. She had been off her medications since she found out she was pregnant, about 1 ½ months prior. Tr. 1370. She had been taking her fiancée's muscle relaxants in order to sleep and, two days before her visit, she took six muscle relaxants intending to terminate her pregnancy. Tr. 1370. Upon exam, insight and judgment were poor and she was placed at a high risk of suicide. Tr. 1370.

On January 25, 2013, Carson was admitted to Marymount Hospital for depression and suicidal ideation. Tr. 1381. She was still not taking her prescription medications. Tr. 1381. Regarding her prior suicidal ideation and intention to terminate her pregnancy on her own by taking medication, Carson stated, "I'm just tired of having my babies taken away and don't want to go through with this, but I never said I want to hurt myself or the baby." Tr. 1381. She denied any prior substance abuse. Tr. 1382. Upon exam, her behavior was pleasant, interactive, and

6

appropriate. Tr. 1383. She was angry about her admission. Tr. 1383. She was advised to resume her medications and referred to outpatient mental health services. Tr. 1385.

On April 9, 2013, Carson was admitted to Metro Hospital complaining of lower back pain after falling down some steps the month before. Tr. 1442. She reported decreased fetal movement, suicidal ideations and auditory and visual hallucinations. Tr. 1439. Upon exam in the OB/GYN triage unit, she was depressed and overwhelmed and her judgment and insight were poor. Tr. 1442. She had suicidal ideations but denied audio or visual hallucinations. Tr. 1442. Upon exam in the psychiatry unit, she appeared anxious and her mood was noted as "feels fine." Tr. 1442. She denied suicidal thoughts and auditory or visual hallucinations. Tr. 1442. Her judgment and insight were fair. Tr. 1442. She was assessed a GAF score of 31-40, admitted, and placed on suicide, assault and escape precautions.[3] Tr. 1443.

On June 16, 2013, Carson was seen at Metro for a medication refill. Tr. 1400. She was calm, cooperative, friendly, and well-groomed. Tr. 1402. She was oriented to time, person, and place, and had fair judgment and insight. Tr. 1402. She denied suicidal ideation and hallucinations. Tr. 1402. She was diagnosed with depression, bipolar disorder, and stressors, including the inadequacy of social support and health problems, and assigned a GAF score of 41-50. Tr. 1402. The attending physician observed, "Patient has a history of quick resolution of symptoms, she is known to me, and tells me she is now well and wants out." Tr. 1400.

On January 8, 2014, Carson was admitted to the emergency room at Lutheran Hospital for depression, suicidal ideation, and command auditory hallucinations. Tr. 1518. Her attending

---

[3] A GAF score between 31 and 40 indicates "some impairment in reality testing or communication (e.g., speech at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." DSM-IV-TR, at 34.

7

physician assigned a GAF of 25[4] and observed that Carson's behavior is considerably influenced by delusions, hallucinations, or serious impairments in communication or judgment. Tr. 1523. Her medications were adjusted, her symptoms improved, and she was discharged on January 10, 2014, in stable condition. Tr. 1518.

Carson was again hospitalized at Lutheran Hospital on May 13, 2014, complaining of chronic auditory hallucinations that had been increasing in intensity and volume. Tr. 1589. She was non-compliant with her medications for about a month, despite receiving some of her medications two weeks prior to her visit. Tr. 1589. She asked to be admitted so that her medications could be corrected and the voices stopped. Tr. 1589. She was diagnosed with a history of medication non-compliance and schizoaffective disorder. Tr. 1592. She was discharged on May 15, 2014, with an improving status and a GAF of 55.[5] Tr. 1594-1594. She agreed to the staffs' recommendation that she be medication compliant. Tr. 1594. Florian Bahr, M.D., wrote that Carson was well known to her from a previous admission, commented on her habitual non-compliance with medication and positive toxicology results showing amphetamine use, and queried whether Carson's non-compliance could, in part, be the result of lower to borderline IQ. Tr. 1602.

### C. Medical Opinion Evidence—Consultative Examiner

On February 7, 2012, Carson saw Richard Davis, MA, for a psychological evaluation. Tr. 777-782. At that time she was living in a tent under a bridge and had been doing so for about a year. Tr. 777.

---

[4] A GAF score between 21 and 30 indicates "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas (e.g. stays in bed all day; no job, home, or friends)." DSM-IV-TR, at 34.

[5] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. DSM-IV-TR, at 34.

She had never tried to obtain a driver's license. Tr. 777. She had been in foster care beginning at age two. Tr. 777. At age 16 she was adopted, but then quit school and her job at Burger King and ran away from her adoptive home back to her biological parents, where she began using drugs and alcohol. Tr. 777. Shortly thereafter, her parents lost their home and Carson "hit the streets." Tr. 777-778. She had seven children with seven different fathers and the children had all been taken away from her; her last child was taken six months ago because she was living with the child in the tent. Tr. 778.

Carson reported that she was in special classes in school and received poor grades. Tr. 778. She had been arrested 10 or more times for prostitution to support her drug habit. Tr. 778. She stated that she stopped using drugs and alcohol in 2006, although she was currently taking painkillers. Tr. 778. She was not, at the time of her visit, seeing a mental health professional. Tr. 778. Davis remarked that Carson "seemed to be fairly clean for someone who lives beneath a bridge and in a tent," and Carson explained that she showers daily at churches, throws away the clothes she had been wearing, and obtains new clothes from the church. Tr. 778-779. Davis commented that Carson was being as cooperative as possible during the examination but that "[h]er intellectual limitations interfered at times....She didn't really have much of an understanding as to why she was being seen by me." Tr. 779. He presented information to her very slowly and she had some difficulty understanding his questions "but basically understood everything eventually." Tr. 779. He had to ask her more than just the original question in order to get an answer to that question, and much of what she presented was "circumstantial, loosely structured, and tangentially presented with poverty of speech but no preservation." Tr. 779. She could not perform serial sevens but could do simple math and remember 8 digits forward and 4 backwards. Tr. 779. After five minutes she could recall 4 out of 10 words. Tr. 779.

9

Carson described her activities of daily living: playing video games in her tent on a device before she goes to bed, spending time at the library during the day to stay warm, finding clothes, and eating. Tr. 780. She has a new boyfriend who lives in an apartment but she will not stay there with him because she has had bad experiences with men. Tr. 780. Davis remarked that Carson tried to fill out forms for the examination "but her spelling is such that her words were not even recognizable." Tr. 780.

In an addendum to his consultative examination, Davis administered intelligence testing on September 5, 2012. Tr. 1300-1303. Carson's scores were as follows: verbal IQ score of 68; performance IQ score of 60; and full scale IQ score of 60. Tr. 1303. Davis explained that, at his previous exam, he indicated that Carson was functioning within the lower borderline range, and that her full scale IQ quotient was within the mild mental retardation range.[6] Tr. 1301. He stated, "However, she seems to have compensated for lackings in other areas by improving her memory." Tr. 1301. Her working memory was at the upper end of the borderline range. Tr. 1301. Davis stated that, even though Carson did "very poorly" on the testing, based on the fact that she previously worked at Burger King for four years and McDonalds for two years, "it appears that, in the correct situation or one that is appropriate for this individual she does have the ability to stay employed, possibly using her memory skills in order to be able to do this." Tr. 1301-1302.

**D. Testimonial Evidence**

   **1. Carson's Testimony**

Carson was represented by counsel and testified at the administrative hearing. Tr. 41-54. She stated that she stays in bed all of the time and that she is hearing voices. Tr. 42. She sees

---

[6] Mild mental retardation is associated with an IQ in the range of 50-55 to approximately 70. *See* DSM-IV-TR, at 42. Borderline intellectual functioning is associated with an IQ in the 71-84 range. *Id*. at 740.

things that are not there and sometimes she wants to kill herself.  Tr. 42.  She has attempted to kill herself occasionally "but it didn't work."  Tr. 42.  She was raped when she was a child and has PTSD and nightmares.  Tr. 42-43.  She also has herniated disc disease.  Tr. 43.

Carson testified that the last time she used drugs and alcohol was in 2006.  Tr. 44.  When she used drugs she used crack cocaine.  Tr. 51.  She gets around town using the bus with tickets she gets from the Children's Family Center.  Tr. 44.  She smokes a half a pack of cigarettes a day and gets them from her boyfriend, who buys bags of tobacco and then they make their own cigarettes.  Tr. 44-45.  As a child she was a slow learner and was in special education classes beginning in kindergarten.  Tr. 47.  She cannot read or write, although, if she picked up a newspaper, she could understand a little bit.  Tr. 45.  When she worked she had to read the screens on the cash registers and her drawer would always end up being short because she would hand out the wrong amounts.  Tr. 47.

She stayed in bed all day because of her depression.  Tr. 46.  This has been going on for a year and it began when her children were taken away from her.  Tr. 46.  She stated that her last child was taken away from her because she could not clean the house.  Tr. 46.  She hears voices every day, even when she is taking medication, and sometimes they tell her to kill herself when she is very, very depressed, and then she tries to.  Tr. 48.  The voices she hears are chattering and bantering.  Tr. 48.  She also has nightmares.  Tr. 48.  The night before the hearing she was sleepwalking; she tore the covers off her bed and tore a hole in the mat on her bed "trying to get some food.  I thought I had some food."  Tr. 49.

Currently, she is living with her boyfriend in a house or an apartment.[7]  Tr. 49.  They interact when "he plays the video game.  I play mine."  Tr. 49.  "I lay on the bed, watch TV, and

---

[7] Carson stated that she lives with her boyfriend and confirmed her street address.  Tr. 46, 49.

11

basically when he wants sex, he just comes to have sex and that's it." Tr. 49. The only person she interacts with is her dad.[8] Tr. 49. She does not interact with more people; she does not want people around. Tr. 49. She gets scared when she gets on the bus. Tr. 49. Currently, she is taking Prozac, Klonopin and Lyrica. Tr. 50. She believes they cause side effects because she has been sleepwalking and "thinking that my bed was food." Tr. 50. She takes a shower once a week and over eats sometimes with some foods. Tr. 50.

Carson stated that she started hearing voices about five years ago. Tr. 51. She always heard something as a kid, "but I never knew it was a voice. I didn't know what it was." Tr. 51. She sees demons: "figures out, out in my eyes. I see my dad, my uncle." Tr. 51. This began five years ago also. Tr. 51. When reminded that she told the consultative examiner that she was not seeing anything at that time, she responded, "Yes I was." Tr. 51.

### 2. Vocational Expert's Testimony

Vocational Expert Thomas Hyman ("VE") testified at the hearing. Tr. 52-66. The ALJ discussed with Carson and the VE Carson's past work. Tr. 52-55. The ALJ asked the VE to determine whether a hypothetical individual of Carson's age and education could perform the work she performed in the past or any other work if that person had the following characteristics: can lift/carry fifty pounds occasionally and twenty-five pounds frequently; can stand, sit and walk six hours out of an eight-hour workday; can frequently push, pull, and use foot pedals; can frequently perform all postural activities such as climbing ladders, ramps and stairs, balancing, stooping, kneeling, crouching or crawling; cannot perform complex tasks but only simple and routine tasks that do not involve high production quotas or piece-rate work; and cannot read or write as part of the job, although the individual can recognize symbols and rudimentary words. Tr. 56-57. The VE answered that such an individual could not perform Carson's past work, but

---

[8] Carson told the consultative examiner that her father was deceased. Tr. 778.

could perform the following jobs: cleaner II (40,000 national jobs, 1,400 Ohio jobs); dining room attendant (200,000 national jobs, 6,200 Ohio jobs); and kitchen helper (195,000 national jobs, 5,700 Ohio jobs). Tr. 57-60.

Next, the ALJ asked the VE whether the individual could perform work if that individual was limited to lifting and carrying twenty pounds occasionally and ten pounds frequently. Tr. 60. The VE answered that such an individual could perform work as a housekeeping cleaner (325,000 national jobs, 7,500 Ohio jobs); arcade attendant (18,000 national jobs, 550 Ohio jobs); tanning salon attendant (1,700 national jobs, 55 Ohio jobs); and parking lot attendant (44,000 national jobs, 1,200 Ohio jobs). Tr. 61.

Carson's attorney asked the VE how often a person can either leave the work setting or be absent altogether before the absenteeism is work-preclusive. Tr. 66. The VE stated that, generally, more than one absence every other month would rule out all jobs. Tr. 66. Carson's attorney asked the VE what amount of time a person can be off task on a job before it becomes work-preclusive, and the VE replied that, outside regularly scheduled breaks, a person off task for more than 5% of the work shift would not be acceptable. Tr. 66-67.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[9] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy.  *Id.*

---

[9] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

### IV. The ALJ's Decision

In his May 20, 2014, decision, the ALJ made the following findings:

1. Ms. Carson has not engaged in substantial gainful activity since November 16, 2011, the application date. Tr. 18.

2. Ms. Carson has the following severe impairments: lumbosacral myofascitis and borderline intellectual functioning. Tr. 18.

3. Ms. Carson does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 20.

4. Ms. Carson has the residual functional capacity to perform a reduced range of medium work with additional nonexertional limitations (*see generally* 20 CFR 416.967(c)). She can lift and carry 50 pounds occasionally and 25 pounds frequently. She can stand and walk up to six hours of an eight-hour day. She can sit for six hours of an eight-hour workday. She can push, pull and use foot pedals frequently. She can frequently perform all postural activities. She can constantly perform manipulative activities, visual activities, and communicative activities. She has no environmental limitations. She is precluded from complex tasks. She can perform simple (routine) tasks. She is precluded from high production quotas or piece-rate work. She is limited to reading/recognizing and writing rudimentary words (e.g., words with pictures related to hygiene and sanitation in the work-related setting). Tr. 26.

5. Ms. Carson has no past relevant work. Tr. 29.

6. Ms. Carson was born on January 13, 1982 and was 29 years old, which is defined as a younger individual age 18-49, on the date Ms. Carson filed the application. Tr. 30.

7. Ms. Carson has a limited education and is able to communicate in English. Tr. 30.

8. Transferability of jobs skills is not an issue, as Ms. Carson does not have past relevant work. Tr. 30.

9. Considering her age, education, work experience and residual functional capacity, there are jobs that exist in significant number in the national economy that she can perform. Tr. 30.

15

10.     Ms. Carson has not been under a disability, as defined in the Social Security Act, since November 16, 2011, the date Ms. Carson filed the application. Tr. 31.

### V. Parties' Arguments

Carson objects to the ALJ's decision on one ground: the ALJ erred when he found that she did not meet or equal Listing 12.05 (Intellectual Disability). Doc. 13, pp. 5-9. In response, the Commissioner submits that substantial evidence supports the ALJ's decision that she did not meet or equal Listing 12.05. Doc. 14, pp. 6-9.

### VI. Law

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### VII. The ALJ's explanation is not supported by substantial evidence

Carson argues that the ALJ erred when he found that she did not meet or equal Listing 12.05, which pertains to Intellectual Disability:[10]

---

[10] Listing 12.05 was formerly titled "mental retardation." *See* 78 Fed.Reg. 46,499-01, 2013 WL 3936340 (August 1, 2013).

16

> Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

20 C.F.R. Pt. 404, Subpt. P, App.1. In order to satisfy the diagnostic description, a claimant must prove that she meets three factors: "(1) subaverage intellectual functioning; (2) onset before age twenty-two; and (3) adaptive-skills limitations." *Hayes v. Comm'r of Soc. Sec.*, 357 Fed. App'x 672, 675 (6th Cir. 2009). Additionally, a claimant must meet at least one of four additional criteria; Carson alleges that she meets or equals the third criteria:

> A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

Listing 12.05(C), 20 C.F.R. Pt. 404, Subpt. P, App.1.

The ALJ found that Carson meets or equals a portion of the third criteria, i.e., she had a full scale IQ of 60. Tr. 23. The ALJ, however, did not state in his decision whether Carson's back problems imposed a significant work-related limitation for purposes under Listing 12.05(C). Since the ALJ found that Carson's lumbosacral myofascitis was a severe impairment, the undersigned assumes for the purposes of this opinion that the ALJ found that Carson's back impairments amounted to a significant work-related impairment under the Section (C) criteria for Listing 12.05.[11]

Thus, the issue before the Court is whether the ALJ erred when he found that Carson could not meet the first requirement of Listing 12.05, i.e., subaverage general intellectual

---

[11] The ALJ found that Carson's lumbosacral myofascitis was a severe impairment. Tr. 18. He did not state whether that impairment imposed an additional and significant work-related limitation pursuant to Listing 12.05(C). Because there is evidence that could support a finding that Carson's back impairment constitutes a significant work-related limitation, and the ALJ did not find otherwise, the undersigned assumes that Carson's back impairment did rise to the level of a significant work-related limitation per Listing 12.05(C). Although both parties include arguments in their briefs regarding whether Carson's back impairment was a significant work-related limitation, it is for the ALJ to decide that issue, not the Court. *See Garner*, 745 F.2d at 387 (the court does not try the case de novo).

17

functioning with deficits in adaptive functioning that initially manifested before Carson turned 22. The ALJ found that Carson did not meet this requirement:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22. Based on M[r]. Davis's additional reflections during the second psychological consultative examination, I find that Ms. Carson has been able to accommodate for cognitive deficits by teaching herself to develop her working memory skills to the "upper end of Borderline Range[.]" Moreover, although Ms. Carson has been forced to give up all of her seven children to the State, she has been able to secure her own bare necessities, including food, safety, shelter (in a tent under a bridge), and medical care, without the assistance of others[.] Significantly, Ms. Carson reported to M[r]. Davis that she was not afraid that her tent would be stolen when she was not in it[.] Accordingly, I find that Ms. Carson's actual functioning does not appear to be consistent with "significantly subaverage general intellectual functioning with deficits in adaptive functioning" prior to the age of 22, as the threshold introductory paragraph of Listing 12.05 requires.

Tr. 23.

Simply put, the ALJ found that Carson did not have significantly subaverage general intellectual functioning and deficits in adaptive functioning because her memory skills had developed to a point slightly higher than the rest of her woefully subaverage scores. Without further explanation, this is not "substantial evidence." There is no logical bridge between the ALJ's further explanations—that Carson can "secure her own necessities" by living in a tent under a bridge, finding food, and going to the hospital when absolutely necessary—and a finding of no significant subaverage intellectual functioning and deficits in adaptive functioning. *See Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D.Ohio 2011)("[T]his Court cannot uphold an ALJ's decision, even if there 'is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result[,]'" quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)). And,

although the ALJ referenced that Carson had all of her seven children taken from her by the state, he does not explain how this factored into his decision.[12]

Moreover, the few explanations offered by the ALJ do not support his conclusion.  For instance, Carson was able to "secure" medical care by going to the emergency room, primarily when she had been off her medications and/or after a suicide attempt.  She did not establish outpatient care with a provider.  *See, e.g.*, Tr. 778 (Consultative examiner Davis noting that Carson had not been seeing a mental health professional and commenting, "She still has Medicaid and I am not certain as to why she doesn't avail herself of that either.").  Although the ALJ found that Carson had been able to secure the bare necessity of "safety," the record reflects that Carson reported she had been raped in 2011 and 2012 (1169, 1373) and told Davis that she had been robbed recently and lost all forms of identification.  Tr. 777, 780.  In light of this, the fact that she told Davis that she was not afraid that her tent would be stolen when she was not in it does not seem "significant," as the ALJ characterized it.  Finally, a finding that living in a tent under a bridge is securing "shelter," while technically correct, requires more explanation to link it to a finding of no significant subaverage intellectual functioning or deficits in adaptive functioning, especially in light of the fact that Carson lived in the tent in the winter and she had other warmer places that she could have stayed, such as with her mother or in her then-boyfriend's apartment.  *See* Tr. 214, 780.

Because there is no logical bridge between the evidence cited by the ALJ and the ALJ's conclusion with respect to Listing 12.05(C), the Commissioner's decision must be reversed and remanded.  Carson asks the Court to grant benefits outright based on a finding that she meets or equals Listing 12.05(C) or to remand this case for the ALJ to reconsider whether Carson meets or equals Listing 12.05(C) and consult with a medical expert in doing so.  Doc. 13, p. 8.  The

---

[12]  The record shows that Carson had *eight* children, all of whom had been taken by the state.  *See* Tr. 46, 1524.

undersigned recommends that this case be remanded to the ALJ to consult with a medical expert regarding whether Carson meets or medically equals Listing 12.05(C).

### VIII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **REVERSED** and **REMANDED** for further proceedings consistent with this opinion.[13]

Dated: August 17, 2016

Kathleen B. Burke
United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).

---

[13] This recommendation should not be construed as a recommendation that, on remand, Carson be found to meet or medically equal Listing 12.05(C).